IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JONATHON E. SHULTZ,

    Plaintiff,

v.                                                                                          1:16-cv-00080-LF

NANCY A. BERRYHILL,[1]
Acting Commissioner of the
Social Security Administration,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on plaintiff Jonathon E. Shultz's Motion to Reverse and Remand for Rehearing with Supporting Memorandum (Doc. 21), which was fully briefed on January 30, 2017. *See* Docs. 25, 28, 29. The parties consented to my entering final judgment in this case. Docs. 6, 8, 9. Having meticulously reviewed the entire record and being fully advised in the premises, the Court finds that the Administrative Law Judge ("ALJ") failed to follow and apply Social Security Ruling ("SSR") 83-20 in determining Mr. Shultz's disability onset date. The Court therefore GRANTS Mr. Shultz's motion and remands this case to the Commissioner for further proceedings consistent with this opinion.

**I.     Standard of Review**

The standard of review in a Social Security appeal is whether the Commissioner's final decision[2] is supported by substantial evidence and whether the correct legal standards were

---

[1] Nancy A. Berryhill, the new Acting Commissioner of Social Security, is automatically substituted for her predecessor, Acting Commissioner Carolyn W. Colvin, as the defendant in this suit. FED. R. CIV. P. 25(d).

applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008). If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks and brackets omitted). The Court must meticulously review the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the Court may not reweigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

**II.     Applicable Law and Sequential Evaluation Process**

To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or

---

[2] The Court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which generally is the ALJ's decision, 20 C.F.R. § 416.1481, as it is in this case.

2

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).

When considering a disability application, the Commissioner is required to use a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show: (1) the claimant is not engaged in "substantial gainful activity;" (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) the impairment(s) either meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1260–61. If the claimant cannot show that his or her impairment meets or equals a Listing but proves that he or she is unable to perform his or her "past relevant work," the burden of proof shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering the claimant's residual functional capacity ("RFC"), age, education, and work experience. *Id.*

### III. Procedural History

Mr. Shultz was born in 1973, completed two years of college, and has past work experience as a data entry clerk, store clerk, support technician at a call center, and as a network administrator at a school. AR 28, 177, 207.[4] Mr. Shultz filed applications for supplemental

---

[3] 20 C.F.R. pt. 404, subpt. P, app. 1.

[4] Documents 12-1 through 12-15 comprise the sealed Administrative Record ("AR"). When citing to the record, the Court cites to the AR's internal pagination in the lower right-hand corner of each page, rather than to the CM/ECF document number and page.

security income ("SSI") and disability insurance benefits ("DIB") in January of 2012. AR 177–89. He alleged disability since May 29, 2010[5] due to a herniated lumbar disc and sciatica. AR 39, 206. The Social Security Administration ("SSA") denied his claims initially on May 30, 2012. AR 72–91. The SSA denied his claims on reconsideration on June 7, 2013. AR 92–115. Mr. Shultz requested a hearing before an ALJ. AR 136–38. On August 5, 2014, ALJ Donna Montano held a hearing. AR 36–71. ALJ Montano issued her unfavorable decision on September 22, 2014. AR 18–35.

The ALJ found that Mr. Shultz met the insured status requirements of the Social Security Act through December 31, 2010. AR 25. At step one, the ALJ found that Mr. Shultz had not engaged in substantial, gainful activity since his alleged onset date of May 29, 2010. *Id.* At step two, the ALJ found that Mr. Shultz suffered from the following severe impairments: obesity, herniated lumbar disc, L5-S1 paracentral disc extrusion with mass effect on left SI nerve root, and chronic pain disorder. *Id.* The ALJ found that Mr. Shultz had the additional severe impairments of severe depression and anxiety beginning on his established onset date of January 9, 2012. *Id.* At step three, the ALJ found that none of Mr. Shultz's impairments, alone or in combination, met or medically equaled a Listing. *Id.* Because the ALJ found that Mr. Shultz's impairments did not meet a Listing, the ALJ assessed Mr. Shultz's RFC. AR 25–28. The ALJ set two separate RFCs for Mr. Shultz: one for the period prior to January 9, 2012, and one for the period beginning January 9, 2012.[6] *Id.* For the period prior to January 9, 2012, the ALJ

---

[5] Mr. Shultz initially alleged disability onset dates of July 1, 2011, and then August 1, 2009. AR 190–91. He ultimately amended his alleged onset date to May 29, 2010. AR 39.

[6] To qualify for DIB, a claimant must establish disability on or before his date last insured. *See* 20 C.F.R. §§ 404.101, 404.120, 404.315. The ALJ found that Mr. Shultz failed to establish that he was disabled before his date last insured of December 31, 2010, and therefore was not entitled to DIB. AR 30 SSI benefits are not payable until the month following the month in which the

4

found that Mr. Shultz had the RFC to perform a full range of sedentary work. AR 25. "Beginning on January 9, 2012," the ALJ found that Mr. Shultz had the RFC to perform less than a full range of sedentary work, in that he

> can stand and/or walk for two hours in an eight-hour workday; sit for six hours in an eight hour workday; is limited to occasional climbing, kneeling, crouching, stooping, crawling. He must however, have an option to change positions from sitting to standing at will; and would need to take two extra breaks in addition to usual and customary breaks and lunch; and he would be off task up to 10 percent of day due to chronic pain or depression.

AR 27.

At step four, the ALJ concluded that Mr. Shultz was unable to perform his past relevant work as network administrator, support technician at a call center, data entry clerk or liquor store clerk. AR 28. At step five, prior to January 9, 2012, and based on an RFC for a full range of sedentary work, the ALJ found that Mr. Shultz was not disabled under section 204.00 of the Medical-Vocational Guidelines. AR 29. At step five, beginning on January 9, 2012, and based on an assessed RFC with less than a full range of sedentary work, the ALJ found that there were no jobs that exist in significant numbers in the national economy that Mr. Shultz could perform. AR 29–30. The ALJ therefore found him disabled at step 5 for the period beginning on January 9, 2012. AR 30.

On October 24, 2014, Mr. Shultz requested review of the ALJ's unfavorable decision by the Appeals Council. AR 17. Mr. Shultz submitted additional evidence to the Appeals Council, which the Appeals Council made part of the record. AR 6. On December 8, 2015, the Appeals

---

claimant applies. *See* 20 C.F.R. § 416.501. Mr. Shultz filed his concurrent claim for SSI on January 17, 2012, making February 2012 the first month he was eligible for benefits. AR 184–89; s*ee also* Doc. 25 at 6. The ALJ appears to use January 9, 2012 as a line of demarcation due to her mistaken belief that Mr. Shultz protectively filed both his DIB and SSI applications on January 9, 2012; the record shows a protective filing date of January 10, 2012 for DIB, and January 17, 2012 for SSI. AR 22, 177, 184.

5

Council denied the request for review. AR 1–7. Mr. Shultz timely filed his appeal to this Court on February 3, 2016. Doc. 1.[7]

## IV. Mr. Shultz's Claims

Mr. Shultz raises five arguments for reversing and remanding this case: (1) the ALJ failed to follow and apply SSR 83-20 in determining the onset of his disability, (2) the Appeals Council failed to properly consider the opinion of Dr. John Vigil, (3) the ALJ failed to perform a proper treating physician analysis of Dr. Valerian Gieri's opinion for the period before January 9, 2012, (4) the ALJ failed to account for the limiting effects of his severe obesity; (5) the ALJ failed to properly analyze his allegations of pain and other symptoms. Doc. 21 at 2, 9–21. Because I remand based on the ALJ's failure to follow and apply SSR 83-20, I do not address the other alleged errors, which "may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## VI. Analysis

Mr. Shultz argues that his back pain, depression, and anxiety are slowly progressive impairments. Doc. 21 at 11. He further asserts that there is "a dearth of medical information in the record" about the progression of these impairments between May 29, 2010 (his alleged date of onset) and January 9, 2012 (the date the ALJ found him disabled from these impairments). *Id.* at 11–12. Mr. Shultz argues that the record about the onset of his disabilities is ambiguous, and that the ALJ therefore erred by failing to call on a medical advisor. Doc. 28 at 2–3. The Commissioner responds that the record is not ambiguous, and that the ALJ was not required to call a medical advisor. Doc. 25 at 7–8. I agree with Mr. Shultz.

---

[7] A claimant has 60 days to file an appeal. The 60 days begins running five days after the decision is mailed. 20 C.F.R. § 416.1481; *see also* AR 3.

### A. Relevant Law

"The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations." SSR 83-20, 1983 WL 31249, at *1. The ALJ must establish an onset date of disability, and "it is essential that the onset date be correctly established and supported by the evidence." *Id.* To be eligible for disability insurance benefits, a claimant must prove that he is disabled during the period he is still insured for disability benefits. *Id.* However, "the expiration of insured status is not itself a consideration in determining when disability first began." *Id.*

In determining the onset date of disabilities with nontraumatic origins, the ALJ must consider several factors: "the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." *Id.* at *2. The ALJ should adopt the onset date alleged by the individual if it is consistent with the all of the available evidence. *Id.* at *3. Medical evidence, however, is the most important factor in determining the onset date, and the onset date can never be inconsistent with the medical evidence. *Id*. at *2.

When the medical evidence does not establish a precise onset date, the ALJ may have to "infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." *Id.*; *see also Blea v. Barnhart*, 466 F.3d 903, 909 (10th Cir. 2006). "With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." SSR 83-20, 1983 WL 31249, at *2.

> The regulation provides two examples of situations where it may be necessary to infer an onset date: (1) in the case of a slowly progressing impairment, "when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available," and (2) when "onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination."

*Blea*, 466 F.3d at 909 (quoting SSR 83-20, 1983 WL 31249, at *3). The onset date selected by the ALJ must have a "legitimate medical basis," *Blea* 466 F.3d at 909, and a "[c]onvincing rationale must be given for the date selected," SSR 83-20, 1983 WL 31249, at *3.

The Tenth Circuit has held that "where medical evidence of onset is ambiguous, an ALJ is obligated to call upon the services of a medical advisor." *Blea*, 466 F.3d at 911 (internal citations and quotation omitted). "Thus, the issue of whether the ALJ erred by failing to call a medical advisor turns on whether the evidence concerning the onset of [the claimant's] disabilities was ambiguous, or alternatively, whether the medical evidence clearly documented the progression of his conditions." *Id.* at 912. "In the absence of clear evidence documenting the progression of [the claimant's] condition, the ALJ [does] not have the discretion to forgo consultation with a medical advisor." *Id.* at 911–12 (quoting *Bailey v. Chater*, 68 F.3d 75, 79 (4th Cir. 1995)). An ALJ "may not make negative inferences from an ambiguous record; rather, [he or she] must call a medical advisor pursuant to SSR 83-20." *Id.* at 913.

### B. The ALJ erred in failing to apply SSR 83-20, and in failing to consult a medical advisor.

#### a. The ALJ erred by not applying SSR 83-20.

In this case, the ALJ found Mr. Shultz disabled as of January 9, 2012. AR 30. Thus, it is not disputed that Mr. Shultz is currently disabled. What is in dispute is when Mr. Shultz became disabled. *See Blea*, 466 F.3d at 908–09. Mr. Shultz contends that the ALJ was required to apply SSR 83-20 to determine whether his physical and mental impairments were already at a disabling level of severity between May 29, 2010 and January 9, 2012. Doc. 21 at 10. The Commissioner counters that "[t]he ALJ reasonably evaluated the record as a whole—including Plaintiff's subjective complaints and the very limited medical evidence—and reasonably determined that Plaintiff failed to establish disability prior to his December 2010 date last insured." Doc. 25 at 5.

8

However, "the issue of whether a medical advisor is required under SSR 83-20 does not turn on whether the ALJ could reasonably have determined that [the claimant] was not disabled before [his date last insured]." *Blea*, 466 F.3d at 911 (quoting *Grebenick v. Chater*, 121 F.3d 1193, 1200–01 (8th Cir. 1997)). And "the expiration of insured status is not itself a consideration in determining when disability first began." SSR 83-20, 1983 WL 31249, at *1. As in *Blea*, the Commissioner's argument that substantial evidence supports an ALJ's five-step sequential analysis "fails to address the crux of the issue." *Blea*, 466 F.3d at 911. Even if there is substantial evidence supporting the ALJ's five-step sequential analysis, an ALJ cannot "ignore the clear directives of SSR 83-20, which is 'binding on all components of the Social Security Administration.'" *Id.* (citing 20 C.F.R. § 402.35(b)(1)). The ALJ erred by failing to apply the directives contained in SSR 83-20.

### b. Mr. Shultz had slowly progressive impairments.

Mr. Shultz asserts that both his back pain and his mental impairments are slowly progressive impairments. Doc. 21 at 11. The Commissioner does not challenge this assertion. The medical records show that Mr. Shultz had slowly progressive impairments, but they fail to establish the precise date his impairments became disabling. *See* SSR 83-20, 1983 WL 31249, at *2.

Mr. Shultz testified that he first injured his back at the age of 16, when he was involved in an accident on a three wheeler. AR 40. He further testified that, at the age of 19, he exacerbated his injury by lifting a 50-pound bag of flour while working at a pizza restaurant. *Id.* (stating that he "turned to [his] left and felt something snap and I assume that's what throwing your back is"). Mr. Shultz reported that his "pain became progressively worse after he started

9

caring for his father sometime around 2009," as he noted more and more back spasms and "grinding" in his back caused by lifting his father. AR 565.

On May 25, 2010, Mr. Shultz complained to his medical provider of "chronic low back pain," reporting a history of a motor vehicle accident and a sprain. AR 318. The provider ordered an x-ray of the lumbar spine. *Id.* The June 7, 2010 radiology report noted that Mr. Shultz suffered from "chronic left-sided [sacroiliac] joint pain" and "chronic back pain." AR 355. The radiology report indicated that Mr. Shultz had "early anterior osteophytes versus DISH"[8] and "mild anterior wedging of T12," but no "other significant degenerative changes" or "acute abnormalit[ies]." *Id.* Based on the x-ray findings, at his June 29, 2010 follow-up visit, Mr. Shultz's provider diagnosed him with muscle strain. AR 317.

Mr. Shultz testified that he did not seek further treatment for his back pain, such as chiropractic treatment, until 2011 because he was uninsured. AR 40. On June 7, 2011, after a gap in treatment, Mr. Shultz complained to a provider of "back pain," "multiple strains," and "pain in center of lower back–for years but recently worse." AR 314. He also reported excruciating pain that shoots down his left leg. *Id.* The provider made a notation of "*2 mnths" on the record for this visit, but it is unclear if the notation refers to the pain in the center of his lower back, or to his excruciating leg pain. *Id.*

---

[8] Osteophyte refers to a bony projection or "bone spur." Bone Spurs, Diseases and Conditions, Mayo Clinic, available at http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/definition/con-20024478 (last visited Sept. 22, 2017). DISH refers to Diffuse Idiopathic Skeletal Hyperostosis, which is "a bony hardening (calcification) of ligaments in areas where they attach to [the] spine." DISH, Diseases and Conditions, Mayo Clinic, available at http://www.mayoclinic.org/diseases-conditions/diffuse-idiopathic-skeletalhyperostosis/ basics/definition/con-20024713 (last visited Sept. 22, 2017).

On November 1, 2011, Mr. Shultz was diagnosed with "back pain [with] radiculopathy."[9]
AR 313. He was advised to resume Flexeril, a muscle relaxant, was advised to continue stretching at home, and advised to follow up with physical therapy. *Id.* On December 7, 2011, Mr. Shultz told his provider that Flexeril did not help, and he was referred for a MRI and an epidural injection. AR 312. On December 26, 2011, Mr. Shultz had an MRI, which showed

> L5-S1 posterior left paracentral disk extrusion with mild inferior extension as well as mass effect upon the left S1 nerve root; there is also inferior left neural foraminal narrowing at this level. Clinical correlation is suggested given the clinical history.

AR 309. On January 26, 2012, Mr. Shultz underwent a CT-guided epidural steroid injection. AR 324. On February 7, 2012, Mr. Shultz reported to his provider that the epidural injection "didn't have much effect," and he was having continuous muscle spasms in his back. AR 311. His doctor administered lidocaine trigger point injections, discontinued the Flexeril, started him on Baclofen[10] and gabapentin, and recommended traction and a new bed, if possible. *Id.*

On March 10, 2012, Mr. Shultz saw Dr. Kristen Widmer, for a physical consultative exam. AR 400–03. On exam, Dr. Widmer found that Mr. Shultz had limited range of motion in his lumbar spine, and limited ability to do straight leg raises from a supine position. AR 402. Dr. Widmer opined that Mr. Shultz had functional limitations with sitting, walking, and lifting. AR 403.

---

[9] Radiculopathies, commonly caused by herniated intervertebral discs, are nerve root disorders caused by pressure on a nerve root. Nerve Root Disorders, Merck Manual Professional Version, available at http://www.merckmanuals.com/professional/neurologic-disorders/peripheral-nervous-system-and-motor-unit-disorders/nerve-root-disorders (last visited Sept. 20, 2017).

[10] Baclofen is a muscle relaxant used to relieve "spasms, cramping, and tightness of muscles caused by medical problems." PubMedHealth, Micromedex Consumer Medication Information, available at https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009200/?report=details (last visited Sept. 22, 2017).

On July 14, 2015, Dr. Valerian Gieri, after treating Mr. Shultz for approximately five months, completed a medical source statement, finding that Mr. Shultz had a marked limitation in his ability to maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently (i.e. 2-hour segments), and a marked limitation in his ability to complete a normal workday and workweek without interruptions from pain or fatigue-based symptoms, and to perform at a consistent pace without an unreasonable number of rest periods. AR 46, 513. Dr. Gieri indicated that Mr. Shultz "currently suffers from chronic back pain," and that his pain was severe—causing sleep disturbances, fatigue, and requiring him to lie down at regular intervals. AR 513. Dr. Gieri also indicated that Mr. Shultz was unable to maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently because of pain; he could occasionally lift and/or carry less than 20 pounds, and frequently lift and/or carry less than 10 pounds; could stand and/or walk at least 2 hours in an 8-hour day; must periodically alternate between sitting and standing to relieve pain and/or discomfort; and was limited in lower extremities due to low back pain and sciatica. AR 514.

On February 27, 2015, Dr. John Vigil reviewed the medical records and physically examined Mr. Shultz. AR 564–71. Dr. Vigil opined that, from at least 2009, Mr. Shultz's impairments precluded him from doing even sedentary work:

> After careful review of the medical record and conducting a consultative evaluation and functional impairment rating of Mr. Jonathon Shultz, it is my opinion that within a reasonable medical probability that this patient has moderately severe to severe functional limitations and is severely limited in both vocational and avocational activities secondary to his chronic low back pain with radiculopathy.
>
> It is my opinion that Mr. Shultz'[s] disabilities, including his chronic pain and comorbid psychiatric conditions preclude his [] performing even sedentary work on a full-time and sustained basis from at least 2009. It is my opinion that Mr. Shultz has significant depression which is currently untreated and would benefit

12

> from a psychiatric evaluation and treatment of his depression which is also significantly contributing to his inability to work.

AR 568.

### c. The onset date of Mr. Shultz's disability is ambiguous.

The crux of the dispute between the parties is whether the medical evidence concerning the onset of Mr. Shultz's disabilities was "ambiguous," or whether it "clearly documented the progression of his conditions." *See Blea*, 466 F.3d at 912. Mr. Shultz argues that the medical evidence regarding the onset of disability from his back pain and his mental impairments is ambiguous. Doc. 21 at 11–12. The Commissioner argues that the evidence prior to December 31, 2010, Mr. Shultz's date last insured, was "not ambiguous" because it "failed to show a possibility" that Mr. Shultz's impairments were disabling as of December 31, 2010. Doc. 25 at 7–8 (quoting *Bigpond v. Astrue,* 280 F. App'x 716, 717 (10th Cir. 2008) (unpublished)). The Court finds the medical evidence about the progression of Mr. Shultz's impairments is ambiguous because it does not "clearly document" the progression of his conditions. *Blea*, 466 F.3d at 912. The Court, therefore, finds that the ALJ erred by failing to call a medical advisor. *Id.*

Mr. Shultz argues, and I agree, that his case is factually similar to *Blea v. Barnhart*, 466 F.3d 903. Doc. 28 at 2. In *Blea*, the Tenth Circuit concluded that the record was ambiguous under the following circumstances:

> In June 1998, six months before his last-insured date, Mr. Blea appeared not to be experiencing a significant amount of pain; however, by January 2000, approximately one year after his last-insured date, Mr. Blea exhibited symptoms, including complaints of pain, difficulty walking, and degenerative changes present on x-rays. The condition was advanced enough by February 2000 to permit a treating physician to diagnose him with "significant post-traumatic arthritis."

*Blea*, 466 F.3d at 913. Similarly, in Mr. Shultz's case, in May and June 2010, six to seven months before his last-insured date, Mr. Shultz reported chronic low back pain to his provider. AR 318. By June of 2011, six months after his last-insured date, Mr. Shultz's doctor noted "back pain—multiple sprains," "pain in lower back—for years but recently worsening," and excruciating pain down his left leg. AR 314. On December 26, 2011, approximately one year after his date last insured, Mr. Shultz finally obtained an MRI which revealed a herniated disc and a disc extrusion. AR 309. The ALJ found that Mr. Shultz's herniated lumbar disc, L5-S1 left paracentral disc extrusion with mass effect on left SI nerve root, and chronic pain disorder had been severe impairments since May 2010, and had reached a disabling level starting on January 9, 2012. AR 25, 27. The ALJ, however, failed to set forth a "legitimate medical basis" or a "convincing rationale" for the onset date she selected, as required by *Blea* and SSR 83-20. *See Blea* 466 F.3d at 909; SSR 83-20, 1983 WL 31249, at *3.[11] And, as in *Blea*, there are no medical records for the six months prior to the date last insured—here June 29, 2010 to December 31, 2010. Because the medical record is silent for a critical period, as in *Blea*, "the

---

[11] The ALJ similarly failed to set forth a "legitimate medical basis" or a "convincing rationale" for the onset date as connected to Mr. Shultz's mental disabilities. A medical report from May 2010 indicates that Mr. Shultz had a "history of anxiety." AR 376. The ALJ found that Mr. Shultz only had the impairments of severe depression and anxiety beginning on January 9, 2012 (the date she selected as his established onset date). AR 25. The primary reason the ALJ gave for finding his mental impairments did not limit him prior to his date last insured (December 31, 2010) is that Mr. Shultz had "no real treatment for a mental health impairment prior to the expiration of his insured status." AR 26. However, the ALJ found Mr. Shultz disabled as of January 9, 2012, despite the fact that the first documented treatment for mental health impairments she notes did not occur until March 2012. *See* AR 28 (citing AR 419–22). The Court is thus left to conclude that the ALJ determined that Mr. Shultz was disabled as of January 9, 2012 primarily based on his back impairments. The limitations in the RFC for the period beginning on January 9, 2012 primarily stem from Mr. Shultz's physical impairments, with the exception of the need to take extra breaks "due to chronic pain **or** depression." AR 27 (indicating that extra breaks would be needed for either impairment).

ALJ should have called a medical advisor to assist in making reasonable inferences." *Blea*, 466 F.3d at 913.

The Commissioner argues that *Blea* is factually distinguishable from this case. She argues that in *Blea*, the claimant did not seek any medical treatment during the 18-month period that included his date last insured, whereas in this case there are records from before and after December 2010 (his date last insured), and these records fail to show Mr. Shultz had any functional limitations beyond those found by the ALJ. Doc. 25 at 7. The Commissioner argues that the medical records before the date last insured in Mr. Shultz's case "simply failed to demonstrate that any physical or mental impairment resulted in any functional limitations beyond those found by the ALJ." *Id.* Mr. Shultz responds that the ALJ in this case, like the ALJ in *Blea*, impermissibly drew inferences from a lack of treatment. Doc. 28 at 2. Mr. Shultz argues that ambiguity does not result only from a lack of treatment records. *Id.* at 2–3. He asserts that medical records themselves can be ambiguous, and he emphasizes that the Tenth Circuit has held that "an ALJ may not make negative inferences from an ambiguous record; rather it must call a medical advisor pursuant to SSR 83-20." *Id.* at 3 (quoting *Bigpond*, 280 F. App'x at 717). Mr. Shultz is correct.

In finding Mr. Shultz not disabled prior to his date last insured, as in *Blea*, the ALJ drew inferences from the ambiguous medical record which were "not reasonable because they [did] not necessarily flow from the facts." *Blea*, 466 F. 3d at 912. Therefore, the ALJ's inferences are insufficient to support her conclusion that Mr. Shultz was not disabled from his impairments prior to his date last insured. In rejecting Mr. Shultz's alleged onset date, the ALJ stated that

> In terms of the claimant's alleged back impairment, the evidence shows no treatment for a back condition prior to the claimant's date last insured. The record shows only treatments for unrelated illnesses and/or visits that were routine in nature (Exhibits lF and 2F).

> While treatment notes show that the claimant did complain of back pain on May 25, 2010, he was diagnosed only with a muscle strain and was advised only to use heat and stretch, and attempt to get into some form of physical therapy (Exhibit lF/26). The claimant did not seek any further treatment for his back until June 7, 2011, well after his date last insured. He indicated at that time that the pain has existed for years but has been worsening only over the last two months (Exhibit lF/22).

AR 26.

The Commissioner argues that Mr. Shultz failed to provide "evidence supporting any disabling limitations" before December 31, 2010 (his date last insured) because "his [May 25, 2010] physical examination was generally unremarkable" and because the June 7, 2010 "x-ray of his back revealed 'no acute abnormality.'" Doc. 25 at 5 (quoting AR 318, 355). While the Commissioner is correct that the x-ray did not detect his herniated lumbar disc, or his left paracentral disc extrusion, "[p]lain X-rays don't detect herniated disks, but . . . may be performed to rule out other causes of back pain, such as an infection, tumor, spinal alignment issues or a broken bone." Mayo Clinic, Herniated disk, available at http://www.mayoclinic.org/diseases-conditions/herniated-disk/diagnosis-treatment/diagnosis/dxc-20271257 (last visited Sept. 22, 2017); *see also* National Institutes of Health, National Institute of Neurological Disorders and Stroke, Low Back Pain Fact Sheet, available at https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Low-Back-Pain-Fact-Sheet (last visited Sept. 13, 2017) ("X-ray is often the first imaging technique used to look for broken bones or an injured vertebra. X-rays show the bony structures and any vertebral misalignment or fractures. Soft tissues such as muscles, ligaments, or bulging discs are not visible on conventional x-rays."). Mr. Shultz's providers did not find the root of his back pain until December 26, 2011, when an MRI revealed

> L5-S1 posterior left paracentral disk extrusion with mild inferior extension as well as mass effect upon the left S1 nerve root; there is also inferior left

> neural foraminal narrowing at this level. Clinical correlation is suggested
> given the clinical history.

AR 309. Thus, while providers did not detect Mr. Shultz's herniated disc and disc extrusion until December 26, 2011—approximately one year after his date last insured of December 31, 2010—the ALJ herself found that he had suffered from these impairments since his alleged onset date. *See* AR 25 (listing "herniated lumbar disc" and "L5-S1 paracentral disc extrusion with mass effect on left SI nerve root" and "chronic pain disorder" as severe impairments prior to the January 9, 2012 established onset date); AR 26 (finding that these medically determinable impairments reasonably could be expected to cause the alleged symptoms).

The ALJ primarily found Mr. Shultz not disabled prior to January 9, 2012 because she concluded that "the evidence shows no treatment for a back condition prior to [his] date last insured." AR 26. The ALJ noted that after his May 25, 2010 visit, Mr. Shultz did not seek any further treatment for his back until June 7, 2011, "well after his date last insured." *Id*. However, "lack of treatment for an impairment does not necessarily mean that the impairment does not exist or impose functional limitations." *Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. 2010) (unpublished). Further, the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." SSR 96-7p, 1996 WL 374186, at *7.[12] Mr. Shultz testified that he did not seek further treatment for his back pain during 2010 because he was uninsured at that time. AR 40. The fact that "[t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services" is a

---

[12] SSR 96-7p was superseded by SSR 16-3p, 2016 WL 1237954, on March 24, 2016.

legitimate explanation for lack of treatment.[13] SSR 96-7p, 1996 WL 374186, at *8. It is not clear, however, that the ALJ considered Mr. Shultz's lack of insurance, and how this impacted his ability to access care.

In addition, the ALJ impermissibly drew inferences from Mr. Shultz's June 7, 2011 medical record which do not necessary flow from that record. The ALJ stated that at his June 7, 2011 appointment, Mr. Shultz indicated "that the pain has existed for years but has been worsening **only** over the last two months." AR 26 (emphasis added). Mr. Shultz's June 7, 2011 medical record, however, is ambiguous. At that visit, Mr. Shultz complained of "back pain," "multiple strains," and "pain in center of lower back, for years but recently worse." AR 314. He also reported excruciating pain that shoots down his left leg. *Id.* It is unclear whether the record's notation of "*2 mnths" refers to the pain in the center of his lower back, or his excruciating leg pain. *Id.*[14] Consultative examiner Dr. Widmer noted on March 10, 2012, that Mr. Shultz reported "pain has been progressing over the years and in July of 2011, after a long road trip, [he] developed sciatica in the left leg." AR 400. This would support reading the "*2 mnths" notation as referencing his sciatica, rather than the ALJ's reading that all of Mr. Shultz's pain had "only" been worsening for the past two months. In addition, at the hearing, Mr. Shultz testified that his pain gradually worsened over time. AR 60. A medical record from December

---

[13] A provider record on April 26, 2010 confirms Mr. Shultz's loss of insurance, stating that he had a history of taking Lisinopril for his hypertension until he "lost insurance." AR 319. Mr. Shultz testified that he was in the University of New Mexico's healthcare program for low-income patients, but it is unclear how Mr. Shultz's lack of insurance impacted his ability to access medical care, and the ALJ did not discuss the issue. AR 42. While the record shows that Mr. Shultz was able to access some medical care in 2010, it is unclear whether the cost of care was a barrier. *See* AR 317–19.

[14] Mr. Shultz asserts in his brief that the record says "shoots down [left] leg excruciating [for] 2 months." Doc. 21 at 7. The Commissioner asserts in her brief that Mr. Shultz reported "lower back pain that he said he had experienced 'for years but recently worse [in the last] two months.'" Doc. 25 at 2.

8, 2011 notes that Mr. Shultz's "pain [increased] over years." AR 323. Mr. Shultz's brother stated in a sworn letter that he "observed a notable diminished functionality" due to pain since 2006 or 2007. AR 518. Frank Breyer, a friend of Mr. Shultz, stated in a sworn letter that he first noticed Mr. Shultz had dramatic limitations from pain during a fishing weekend in 2008. AR 525. Finally, at his appointment with Dr. John Vigil, Mr. Shultz reported that his "pain became progressively worse after he started caring for his father sometime around 2009," as he noted more and more back spasms and "grinding" in his back caused by lifting his father. AR 565. Whether Mr. Shultz's pain had been progressively worsening for only a few months or for several years is critical to the outcome of this case. The ambiguous June 7, 2011 medical record, on which the ALJ heavily relied, contributes to the ambiguity surrounding the onset date of Mr. Shultz's disabilities.

Finally, the Court notes that on appeal, it has the benefit of an assessment by Dr. Vigil. AR 564–71. In this assessment, which was provided only to the Appeals Council, not to the ALJ, Dr. Vigil opines that "Mr. Shultz'[s] disabilities, including his chronic pain and comorbid psychiatric conditions preclude his [] performing even sedentary work on a full-time and sustained basis from at least 2009." AR 568. While the ALJ did not have the benefit of this assessment, the Court notes that the assessment further undermines the ALJ's decision because it relates to the relevant time period, and creates further ambiguity about Mr. Shultz's onset date. On remand, the ALJ must address Mr. Vigil's opinion, as it now is part of the medical record. *See Blea*, 466 F.3d at 913.

## VI. Conclusion

The ALJ erred by failing to apply SSR 83-20, and by failing to consult a medical advisor to establish an onset date of disability. The Court remands so that the ALJ can remedy this error.

IT IS THEREFORE ORDERED that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 21) is GRANTED.

IT IS FURTHER ORDERED that the Commissioner's final decision is REVERSED, and this case is REMANDED for further proceedings in accordance with this opinion.

_____
Laura Fashing
United States Magistrate Judge
Presiding by Consent